IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ANGIODYNAMICS, INC., AND NAVILYST MEDICAL, INC., PORT CATHETER PRODUCTS LIABILITY LITIGATION<br><br>Terri Ertle,<br><br>Plaintiff,<br><br>vs.<br><br>ANGIODYNAMICS, INC. & NAVILYST MEDICAL, INC.<br><br>Defendants.<br><br>This Document Relates to Civil Action No. | Case No. 3:24-md-03125-JO-VET<br><br>MDL No. 3125<br><br>JUDGE JINSOOK OHTA<br><br>Civil Action No. __'25CV2957 JO    VET__ |

Plaintiff files this Complaint pursuant to CMO No. 1, and is bound by the rights, Protections, privileges, and obligations of that CMO. In accordance with CMO No. 1, Plaintiff hereby designates the United States District Court for Southern District of Indiana as the place of remand as this case may have originally been filed there pursuant to 28 U.S.C. § 1391.

1

## PLAINTIFF'S COMPLAINT AND JURY DEMAND

Plaintiff, by and through her undersigned counsel, brings this Complaint for Damages against Defendants and in support thereof states the following:

1. This is a device tort action brought on behalf of the above-named Plaintiff arising out of the failure of Defendants' AngioDynamics BioFlo Port, an implantable vascular access device ("BioFlo Port" or "product"). As a result, Plaintiff Terri Ertle suffered permanent injuries and significant pain and suffering, emotional distress, lost wages and earning capacity, and diminished quality of life. The Plaintiff respectfully seeks all damages to which she may be legally entitled.

## I.    STATEMENT OF PARTIES

2. Plaintiff Terri Ertle ("Plaintiff") is, and was, at all relevant times, a citizen of the United States and resident of Indiana.

3. Defendant Angiodynamics, Inc. ("Angiodynamics") is a corporation organized and existing under the laws of Delaware, with a principal place of business now and at all relevant times located in Latham, New York. Angiodynamics conducts business throughout the United States, including the State of California. AngioDynamics is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying, selling, marketing and introducing into interstate commerce, either directly or indirectly through third parties or related entities, its medical devices, including the BioFlo Port.

2

4. Defendant Navilyst Medical, Inc. ("Navilyst") is a corporation organized and existing under the laws of Delaware, with its corporate office and principal place of business located in Marlborough, Massachusetts. Navilyst conducts business throughout the United States, including the State of California, and is a wholly owned subsidiary of AngioDynamics. Navilyst is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying, selling, marketing and introducing into interstate commerce, either directly or indirectly through third parties or related entities, its medical devices, including the BioFlo Port.

5. Defendant Angiodynamics and Defendant Navilyst are referred to in the collective, at times herein, as "Defendants."

## II.   JURISDICTION

6. The District Court has original jurisdiction of this civil action pursuant to 28 U.S.C. 1332(a). The amount in controversy exceeds $75,000, exclusive of interests and costs. Plaintiff Terri Ertle is a citizen of Indiana. Defendant Angiodynamics is a citizen of Delaware and New York. Defendant Navilyst is a citizen of Delaware and Massachusetts.

7. Venue of this action on remand is the United States District Court for Southern District of Indiana under 28 U.S.C. 1391(a)(2), by virtue of the facts that (a) a substantial part of the events or omissions giving rise to the claims occurred in

3

that District and (b) Defendants' products are produced, sold to, and consumed by individuals in the State of Indiana, thereby subjecting Defendants to personal jurisdiction in this action and making them all "residents" of that judicial District. Notwithstanding, this action is filed pursuant to a Case Management Order made in an action pending in the Southern District of California on January 27, 2025, requiring that all new actions against Defendants filed elsewhere that would be subject to transfer be filed directly in this Action for all purposes.

8.     Defendants have and continue to conduct substantial business in the Southern District of the State of Indiana, distribute vascular access products in this District, receive substantial compensation and profits from sales of vascular access products in this District, and made material omissions and misrepresentations and breaches of warranties in this District, so as to subject them to in personam jurisdiction in this District.

9.     Consistent with the Due Process Clause of the Fifth and Fourteenth Amendments, this Court has in personam jurisdiction over Defendants because Defendants are present in the State of Indiana, and the State of California, such that requiring an appearance does not offend traditional notices of fair and substantial justice.

### III.   STATEMENT OF FACTS

10.     At all relevant times, each of the Defendants designed, developed,

4

manufactured, licensed, marketed, distributed, sold and/or placed Vascular Access Devices in the stream of commerce, including the AngioDynamics BioFlo Titanium Port and the Xcela Power Port products that is at issue in this lawsuit.

11.    All acts and omissions of each Defendant as described herein were done by its agents, servants, employees, representatives, and/or owners, acting in the course and scope of their respective agencies, services, employments and/or ownership.

12.    At all relevant times, each of the Defendants, was and still is a corporation authorized to do business in the State of California.

13.    At all times hereinafter mentioned, upon information and belief, Defendants were and still are business entities actually doing business in the State of California.

14.    At all times hereinafter mentioned, Defendants were engaged in the business of designing, manufacturing, advertising, marketing, and selling Vascular Access Devices including the AngioDynamics BioFlo Titanium Port (referred to herein as the "BioFlo Port") and the  AngioDynamics Xcela Power Port (referred to herein, at times as "Xcela Power Port"), and in pursuit of this business, transacted business within the State of California and contracted to provide goods and services in the State of California.   Collectively, the BioFlo Port and the Xcela Power Port are referred to herein as "Power Port".

15. At all times hereinafter mentioned, upon information and belief, each Defendant committed tortious acts inside the State of California, which caused injury to Plaintiff.

16. At all times hereinafter mentioned, upon information and belief, Defendants expected or should reasonably expect its acts to have consequences in the State of California.

## A.   DEFENDANTS' VASCULAR ACCESS DEVICES

15. In or about 2007, a company called Rita Medical Systems, Inc. received clearance via the 510(k) Premarket Notification Program from the Food and Drug Administration (FDA) to market and sell a product called Vortex® CT Port Access System.

16. Around the same time, Angiodynamics completed the acquisition of the assets and liabilities of Rita Medical Systems, Inc.

17. Defendants designed, patented, manufactured, labeled, marketed, sold, and distributed various Vascular Access Devices, including the Xcela Power Ports involved in this Action.

18. The Xcela Power Port is one of several varieties of port/catheter systems that has been designed, manufactured, marketed, and sold by Defendants. It is regulated as a percutaneous, implanted, long-term intravascular catheter that is useful in the administration of intravenous medications, including those used in

6

chemotherapy.

19.     According to Defendants, the Xcela Power Port is a totally implantable vascular access device designed to provide repeated access to the vascular system for the delivery of medication, intravenous fluids, parenteral nutrition solutions, and blood products.

20.     The intended purpose of the Xcela Power Port is to make it easier to deliver medications directly into the patient's bloodstream. The device is surgically placed completely under the skin and left implanted.

21.     The Xcela Power Port is a flexible catheter with proximally located luter lock adapter(s) with a pressure activated safety valve, extension tube(s) and suture wing for catheter securement; available in single and dual lumren configurations and effective (usable) length of 55 cm.   The radiopaque catheter is marked with depth indicators along its length. The lumrens are differentiated by proximally located colored hubs that indicate lumen size. Maximum power injection flow rates are indicated on the luer adapter(s). It is provided as a stand-alone device or in kits with other legally marketed products as a convenience to the user to accommodate their particular needs.

22.     The system consists of two primary components: an injection port and a polyurethane catheter which includes additives intended to make it radiopaque. The injection port has a raised center, or "septum," where the needle is inserted for

7

delivery of the medication. The medication is carried from the port into the bloodstream through a small, flexible tube, called a catheter, that is inserted into a blood vessel.

23.    The Xcela Power Port is indicated for patient therapies requiring repeated access to the vascular system. The port system can be used for infusion of medications, I.V. fluids, parenteral nutrition solutions, blood products, for the withdrawal of blood samples, and for power injection of contrast media.

24.    At all times relevant, Defendants misrepresented the safety of the Xcela Power Port system, and negligently designed, manufactured, prepared, compounded, assembled, processed, labeled, marketed, distributed, and sold the Xcela Power Port system as safe and effective device to be surgically implanted to provide repeated access to the vascular system for the delivery of medications, intravenous fluids, parenteral nutrition solutions, and blood products.

25.    At all times relevant to this action, Defendants knew and had reason to know, that the Xcela Power Port was not safe for the patients for whom they were prescribed and implanted, because once implanted the device was prone to fracturing, migrating, perforating internal vasculature and otherwise malfunctioning.

26.    At all times relevant to this action, Defendants knew and had reason to know that patients implanted with a Xcela Power Port had an increased risk of suffering life threatening injuries, including but not limited to: death; hemorrhage;

cardiac/pericardial tamponade (pressure caused by a collection of blood in the area around the heart); cardiac arrhythmia and other symptoms similar to myocardial infarction; severe and persistent pain; and perforations of tissue, vessels and organs, or the need for additional surgeries to remove the defective device.

27.    Soon after the Xcela Power Port was introduced to market, which was years before Plaintiff was implanted with her device, Defendants began receiving large numbers of adverse event reports ("AERs") from health care providers reporting that the Xcela Power Port was fracturing post-implantation and that fractured pieces were migrating throughout the human body, including to the heart and lungs. Defendants also received large numbers of AERs reporting that Xcela Power Port was found to have perforated internal vasculature. These failures were often associated with reports of severe patient injuries such as:

    a.  hemorrhage.
    b.  cardiac/pericardial tamponade;
    c.  cardiac arrhythmia and other symptoms similar to myocardial infarction;
    d.  severe and persistent pain;
    e.  and perforations of tissue, vessels and organs; and
    f.  upon information and belief, even death.

28.    In addition to the large number of AERs which were known to Defendants and reflected in publicly accessible databases, there are many recorded

device failures and/or injuries related to the Defendants' implantable port products which were concealed from medical professionals and patients through submission to the FDA's controversial Alternative Summary Reporting ("ASR") program.

29.     The FDA halted the ASR program after its existence was exposed by a multi-part investigative piece, prompting a widespread outcry from medical professionals and patient advocacy groups.[1]

30.     Prior to the discontinuation of the ASR program, Defendants reported numerous episodes of failures of their implanted port/catheter products – including numerous episodes of catheter fracture – under the ASR exemption, thereby concealing them from physicians and patients.

31.     Defendants were aware or should have been aware that the Xcela Power Port had a substantially higher failure rate than other similar products on the market, yet Defendants failed to warn consumers of this fact.

32.     Defendants also intentionally concealed the severity of complications caused by the Xcela Power Port and the likelihood of these events occurring.

33.     Rather than alter the design of the Xcela Power Port to make it safer or adequately warn physicians of the dangers associated with the Xcela Power Port, Defendants continued to actively and aggressively market the Xcela Power Port as

---

[1]  Christina Jewett, *Hidden Harm: Hidden FDA Reports Detail Harm Caused by Scores of Medical Devices*, Kaiser Health News (Mar. 2019)

safe, despite their knowledge of numerous reports of catheter fracture and associated injuries.

34.   Moreover, Defendants' warnings suggested that fracture of the device could only occur if the physician incorrectly placed the device such that undue catheter compression or "pinch-off" was allowed to occur. In reality, Defendants knew internally these devices were fracturing and causing serious injuries due to defects in the design, manufacturing and lack of adequate warnings.

35.   The conduct of Defendants, as alleged in this Complaint, constitutes willful, wanton, gross, and outrageous corporate conduct that demonstrates a conscious disregard for the safety of Plaintiff. Defendants had actual knowledge of the dangers presented by the Xcela Power Port System, yet consciously failed to act reasonably to:

   a. Adequately inform or warn Plaintiff, her prescribing physicians, or the public at large of these dangers;
   b. Establish and maintain an adequate quality and post-market surveillance system; or
   c. Recall the Xcela Power Port System from the market.

### B.   PLAINTIFF-SPECIFIC FACTUAL BACKGROUND

36.   In February, 2012, Plaintiff underwent placement of an implantable vascular access device, a Power Port, which Defendants manufactured, sold, and/or distributed to Plaintiff, through her doctors, to be used for delivery of drug therapies.

37.    The device was defective.  On June 13, 2018, Plaintiff was taken to the emergency room at Hendricks Regional Health Hospital in Danville, Indiana with high grade fevers and worsening abdominal pain.   It was noted that Plaintiff had a history of cellulitis associated with the port extending up to her neck.   She was diagnosed with bacteremia, and admitted to the hospital.   The infection and bacteremia were caused by the Port-A-Cath.

38.    On June 15, 2018, the Port-A-Cath was surgically removed.  Plaintiff remained hospitalized until June 20, 2018, when she was discharged with antibiotics.

39.    On July 26, 2018, Plaintiff was again admitted to Hendricks Regional Health with severe sepsis with lactic acidosis.  She was discharged on July 29, 2018

40.     On March 25, 2021, Plaintiff was admitted to Hendricks Regional Health Hospital where another Port-A-Cath was implanted, an AngioDynamics BioFlo Titanium Port (Ref: 44-017, LOG 850208), which Defendants manufactured, sold, and/or distributed to Plaintiff through her doctors, to be used for delivery of drug therapies.

41.    The device was defective.  On November 7, 2023, Plaintiff was admitted to Community Hospital Anderson in Anderson, Indiana with complaints of severe abdominal pain.  It was determined that she had developed septicemia and staph epidermidis secondary to an infected Medi-Port (the BioFlo Port).  The Bio-Flo Port was surgically removed, and Plaintiff was discharged on medications on

November 14, 2023.

42.     Plaintiff was hospitalized from June 13, 2018 to June 20, 2018, from July 26, 2019 to July 29, 2019, and from November 2, 2023 until November 14, 2023.

43.     At all times, the BioFlo Port was utilized and implanted in a manner foreseeable to Defendants, as Defendants generated the instructions for use and created procedures for implanting the product.

44.     The BioFlo Port implanted into the Plaintiff was in the same or substantially similar condition as when it left the possession of Defendants, and in the condition directed by and expected by Defendants.

45.     Plaintiff and her physicians foreseeably used and implanted the BioFlo Port, and did not misuse, or alter the BioFlo Port in an unforeseeable manner.

46.     Defendants advertised, promoted, marketed, sold, and distributed the BioFlo Port as a safe medical device when Defendants knew or should have known the BioFlo Port was not safe for its intended purposes and that the product could cause serious medical problems.

47.     Defendants had sole access to material facts concerning the defective nature of the products and their propensity to cause serious and dangerous side effects.

48.     In reliance on Defendants' representations, Plaintiff's doctor was

13

induced to, and did use the BioFlo Port.

49.    As a result of having the BioFlo Port implanted, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, permanent and substantial physical deformity, has undergone and will undergo corrective surgery or surgeries, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and present and future lost wages.

50.    Defendants' BioFlo Port was marketed to the medical community and to patients as safe, effective, reliable, medical devices; implanted by safe and effective, minimally invasive surgical techniques for the treatment of medical conditions, and as a safer and more effective as compared to the traditional products and procedures for treatment, and other competing Vascular Access Devices.

51.    The Defendants have marketed and sold the Defendants' BioFlo Port to the medical community at large and patients through carefully planned, multifaceted marketing campaigns and strategies. These campaigns and strategies include, but are not limited to, direct to consumer advertising, aggressive marketing to health care providers at medical conferences, hospitals, private offices, and/or group purchasing organizations, and include a provision of valuable consideration and benefits to the aforementioned.

52.    The injuries, conditions, and complications suffered due to Defendants'

BioFlo Port include but are not limited to hemorrhage; cardiac/pericardial tamponade; cardiac arrhythmia and other symptoms similar to myocardial infarction; severe and persistent pain; perforations of tissue, vessels and organs; and even death.

53.     Despite diligent investigation by Plaintiff into the cause of her injuries, including consultations with her medical providers, the nature of her injuries and damages, and their relationship to the Product was not discovered, and through reasonable care and diligence could not have been discovered until a date within the applicable statute of limitations for filing Plaintiff's claims. Therefore, under appropriate application of the discovery rule, Plaintiff's suit was filed well within the applicable statutory limitations period.

54.     Plaintiff did not learn of Defendants' wrongful conduct until a time within the applicable statute of limitations. Furthermore, in the existence of due diligence, Plaintiff could not have reasonably discovered the Defendants' wrongful conduct, including, but not limited to, the defective design and/or manufacturing of the product until a date within the statute of limitations. Therefore, under appropriate application of the discovery rule, Plaintiff's suit was filed well within the statutory limitations period.

55.     Defendants were negligent toward Plaintiff in the following respects:

a)     Defendants failed to design and establish a safe, effective procedure for removal of BioFlo Port; therefore, in the event of a

failure, injury, or complications it is difficult to safely remove BioFlo Port.

b)      Defendants provided incomplete, insufficient, and misleading information to physicians in order to increase the number of physicians using BioFlo Port for the purpose of increasing their sales. By so doing, Defendants caused the dissemination of inadequate and misleading information to patients, including the Plaintiff.

56.     The BioFlo Port was utilized and implanted in a manner foreseeable to Defendants.

57.     The BioFlo Port implanted into Plaintiff was in the same or substantially similar condition as when it left the possession of the Defendants, and in the condition directed by the Defendants.

58.     At the time of her operation, Plaintiff was not informed of, and had no knowledge of the complaints, known complications and risks associated with BioFlo Port.

59.     Plaintiff was never informed by Defendants of the defective and dangerous nature of BioFlo Port.

60.     At the time of her implant, neither Plaintiff nor Plaintiff's physicians were aware of the defective and dangerous condition of BioFlo Port.

61.     At the time of the injuries referenced herein, Plaintiff did not know that the surgery she underwent was due to a defect in these products.

16

62.    It was not until a time within the applicable statute of limitations, that Plaintiff discovered Defendants' wrongful conduct. Furthermore, Plaintiff could not have reasonably discovered the Defendants' wrongful conduct, including but not limited to, the defective design and/or manufacturing of these devices until a date within the statute of limitations.  Therefore, under appropriate application of the discovery rule, Plaintiff's suit was filed well within the statutory limitations period.

63.    Plaintiff has suffered and will continue to suffer physical pain and mental anguish.

64.    Plaintiff has also incurred substantial medical bills and has suffered loss of other monies due to the defective product that was implanted in her body.

## IV. STATEMENT OF CLAIM
## COUNT I: NEGLIGENCE

65.    Plaintiff re-alleges and incorporates by reference every allegation of this Complaint as if each were set forth fully and completely herein.

66.    At all relevant times, Defendants had a duty to exercise reasonable and ordinary care in the manufacture, design, labeling, instructions, warnings, sale, marketing, and distribution of the Defendants' BioFlo Port, and recruitment and training of physicians to implant the BioFlo Port.

67.    Defendants breached the duty of care to the Plaintiff, as aforesaid, in the manufacture, design, labeling, warnings, instructions, sale, marketing,

distribution, and recruitment and training of physicians to implant the BioFlo Port.

68.    Defendants breached their duty by failing to comply with state and federal regulations concerning the study, testing, design, development, manufacture, inspection, production, advertisement, marketing, promotion, distribution, and/or sale of the BioFlo Port. Further there were safety features or alternative safer designs that would have reduced the risk of bacteremia/sepsis from the devices.

69.    As a direct and proximate result of the duties breached, the BioFlo Port was defective and failed, resulting in much pain and suffering, mental anguish, doctor visits, subsequent procedures, and substantial medical bills.

70.    As a direct and proximate result of Defendants' negligence, Plaintiff suffered severe pain, injuries and damages.

71.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and will continue to suffer great pain and mental anguish.

72.    Defendants' conduct in continuing to market, sell and distribute the BioFlo Port after obtaining knowledge that the products were failing and not performing as represented and intended, showed complete indifference to or a conscious disregard for the safety of others, justifying an award of additional damages for aggravating circumstances in such a sum which will serve to deter Defendants and others from similar conduct in the future.

73.    Defendants knew or should have known that its failure to exercise

ordinary care in the manufacture, design, labeling, warnings, instructions, sale, marketing, distribution and recruitment and training of physicians to implant the BioFlo Port would cause foreseeable harm, injuries and damages to individuals such as Plaintiff who are implanted with BioFlo Port.

74.     As a direct, proximate and foreseeable result of the Defendants' design, manufacture, labeling, marketing, sale, and distribution of the BioFlo Port, Plaintiff has been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and consortium, and economic damages.

75.     Each act or omission of negligence was a proximate cause of the damages and injuries to Plaintiff.

WHEREFORE, Plaintiff demands judgment against Defendants, and requests compensatory damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT II: STRICT LIABILITY – MANUFACTURING DEFECT

76.     Plaintiff re-alleges and incorporates by reference every allegation of this Complaint as if each were set forth fully and completely herein and additionally or in the alternative, if same be necessary, allege as follows:

77.     Defendants supplied, manufactured, sold, distributed and/or otherwise placed into the stream of commerce the BioFlo Port implanted in Plaintiff. The

BioFlo Port was defective in its manufacture and construction when it left the hands of Defendants in that its manufacture and construction deviated from good manufacturing practices and/or manufacturing specifications as would be used and/or maintained by a reasonably prudent and careful medical device manufacturer.

78.    The BioFlo Port as manufactured and constructed by Defendants was unreasonably dangerous to end consumers including Plaintiff and posed an unreasonable degree of risk, danger and harm to Plaintiff.

79.    The BioFlo Port was expected to reach and did reach Plaintiff's implanting surgeon and Plaintiff without substantial change in the condition in which it was manufactured, supplied, distributed sold and/or otherwise placed in the stream of commerce.

80.    The manufacturing defect in the BioFlo Port implanted in Plaintiff was not known, knowable or readily apparent to Plaintiff's physician or to Plaintiff.  Nor was it discoverable upon any reasonable examination by Plaintiff's physician or Plaintiff. The BioFlo Port was used and implanted in the very manner in which it was intended to be used and implanted by Defendants in accordance with the instructions for use and specifications provided by Defendants.

81.    The BioFlo Port implanted in Plaintiff was different from its intended design and failed to perform as safely as a product manufactured in accordance with the intended design would have performed.

82. The defective and unreasonably dangerous condition of the BioFlo Port product was a proximate cause of damages and injuries suffered by Plaintiff.

83. As a direct and proximate result of the BioFlo Port's aforementioned manufacturing defect, Plaintiff was caused and, in the future, will be caused to suffer severe personal injuries, pain and suffering, severe emotional distress, financial or economic loss, including, but not limited to, obligations for medical services and expenses, and other damages.

84. Defendants are strictly liable to Plaintiff.

WHEREFORE, Plaintiff demands judgment against Defendants and requests compensatory damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT III: STRICT LIABILITY – FAILURE TO WARN

85. Plaintiff realleges and incorporates by reference every allegation of this Complaint as if each were set forth fully and completely herein and additionally or in the alternative, if same be necessary, allege as follows:

86. Defendants manufactured, designed, marketed, sold and/or otherwise placed into the stream of commerce their BioFlo Port vascular access device.

87. The Defendants failed to properly and adequately warn and instruct Plaintiff and her treating physician that BioFlo Port was designed and/or manufactured in a way that could cause injuries and damages including lasting and

21

permanent injuries. Defendants further failed to inform and further warn Plaintiff and her treating physician with respect to the most effective proper technique and methods of implantation and/or the selection of appropriate candidates to receive BioFlo Port.

88.    The Defendants failed to properly and adequately warn and instruct Plaintiff and her treating physician as to the risks and benefits of the Defendants' BioFlo Port. To the contrary, Defendants withheld information from Plaintiff and her treating physician regarding the true risks as relates to implantation of their BioFlo Port.

89.    The Defendants failed to properly and adequately warn and instruct Plaintiff and her treating physician that inadequate research and testing of the BioFlo Port was done prior to BioFlo Port being placed on the market and in the stream of commerce and that Defendants lacked a safe, effective procedure for removal of the BioFlo Port once complications from same arise.

90.    The Defendants intentionally, recklessly, and maliciously misrepresented the efficacy, safety, risks, and benefits of BioFlo Port, understating the risks and exaggerating the benefits in order to advance its own financial interest, with wanton and willful disregard for the rights, safety and health of Plaintiff.

91.    The dangerous and defective conditions in the BioFlo Port existed at the time they were delivered by the manufacturer to the distributor. At the time

Plaintiff had her implant surgery, the BioFlo Port was in the same condition as when manufactured, distributed and sold.

92.    Plaintiff did not know at the time of surgery that the BioFlo Port placed during Plaintiff's surgery or at any time prior thereto, of the existence of the defects or dangerous propensities in the BioFlo Port.

93.    As a direct and proximate result of the Defendants' design, manufacture, marketing, sale, and distribution of the BioFlo Port, Plaintiff has been injured and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and economic damages.

94.    The Defendants are strictly liable in tort to the Plaintiff for their wrongful conduct in failing to properly warn Plaintiff.

95.    WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, interest, attorneys' fees, costs of suit, and such further relief as the Court deems equitable and just.

## PRAYER FOR RELIEF

Plaintiff demands judgment against Defendants and prays for the following relief in accordance with applicable law and equity:

i. Compensatory damages to Plaintiff for past, present, and future damages, including, but not limited to, pain and suffering for severe and permanent personal injuries sustained by Plaintiff, permanent impairment, mental

23

pain and suffering, loss of enjoyment of life, past and future health and medical care costs together with interest and costs as provided by law;

ii. The costs of these proceedings, including past a future cost of the suit incurred herein;

iii. Prejudgment interest on all damages as is allowed by law;

iv. Such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.


Dated: October 31, 2025                    Respectfully submitted,


                                           PLAINTIFF Terri Ertle

                                           By her attorneys,

                                           _____
                                           **Troy A. Brenes**
                                           **BRENES LAW GROUP, P.C.**
                                           Troy A. Brenes (CA Bar No. 249776)
                                           100 Spectrum Center Drive, Suite 330
                                           Irvine, CA 92618
                                           Telephone: 877-690-4899
                                           Facsimile: 949-607-4192
                                           tbrenes@breneslawgroup.com


                                           *Attorneys for Plaintiff*